## SOUTH MISSOURI PINE LUMBER COMPANY, Appellant, v. CROMMER et al.

### Division One, March 28, 1907.

1. **PROMOTER.** A real estate agent and the owners of real estate, who did not help organize the corporation which took over the timbered land contracted for by the incorporators, who, before they had ever seen the agent or the land-owners, had agreed to go into the sawmill business and to organize a corporation and had agreed that two of their number should put in property instead of cash and had agreed upon the stockholders of the corporation, were in no sense promoters of the corporation.

2. **FRAUD: Burden.** Fraud and collusion will not be presumed, and the burden is on the party charging them to satisfy the chancellor that they in fact exist.

3. ———: **Deference to Chancellor.** In an equity case dependent largely on the oral testimony of interested witnesses, some deference should on appeal be extended to the finding of the chancellor, who heard the parties testify, saw their demeanor on the witness stand and read their facial expressions.

4. ———: **Conspiracy.** In this case the owners of timbered land and a sawmill were willing to sell it for $21,000, and agreed to pay a real estate agent $500 to sell it for that price and all he could get above that sum. He applied to a promoter, and the promoter interested some bankers and other parties, and they sent two of their number, including the promoter, to inspect the properties, and they drew up a contract with the owners in which the owners were to be given $21,000 in money and certain real estate in certain cities to be accepted by their agent, and a company was organized for $50,000 and the lands and properties (which in fact were at the time worth $40,000) were turned over to the company as its capital stock, and afterwards it turned out that two of the incorporators, one of whom was the promoter, who it was agreed were to put in certain lands for their sttock, had not done so, and it was then discovered that these two had managed to have the properties taken over at a valuation of $37,500 and it is charged that the land-owners were a party to a conspiracy between them, their agent and the promoter, to work a fraud on the others by a representation that the purchase price was $37,500. The evidence is reviewed, and it is *held* that the conspiracy was not established.

Appeal from St. Louis City Circuit Court.—*Hon. Jas. R. Kinealy*, Judge.

AFFIRMED.

*R. A. Holland* and *Rusk & Stringfellow* for appellant.

Although the evidence amply justifies the conclusion that the Crommers directly participated in the fraudulent scheme of raising the price, it is entirely immaterial under the facts of this case whether or not either one of them so participated or had any knowledge that a fraud was being committed. It is admitted that Newhouse was the agent of the Crommers and they are bound by his fraud; his acts are their acts, his knowledge their knowledge, and this is true, not because of any authority, express or implied, which the Crommers may have given him to commit a fraud, but because of the equitable principle that where two parties are equally innocent he is liable who has made the commission of the wrong possible. Nor is it necessary to show that the Crommers received any part of the raise in the price. The profit which they received was in the sale of their property at twenty-one thousand dollars. They had the right to sell their land to the corporation for that price; but they did not have the right to assist in deceiving Maxwell and Hartwig, either by their direct acts and words, or through the medium of their agent Newhouse. If such deceit and fraud was practiced, it is immaterial who carried off the booty. South Joplin Land Company v. Case, 104 Mo. 572. It is not necessary that a promoter should afterwards become a stockholder in the company. 1 Thomp., Corp., secs. 457, 458, 462; 1 Mor., Priv. Corp. (2 Ed.), sec. 291; Dickerman v. Trust Co., 176 U. S.

203; Burbank v. Dennis, 35 Pac. 444; 23 Am. and Eng. Ency. Law (2 Ed.), 232; Phosphate Co. v. Erlinger, 5 Ch. D. 118, 46 L. J. Ch. 425, 36 L. P. (N. S.) 222; Yale Gas Stove Co. v. Wilcox, 25 L. R. A. 90; Simon v. Vulcan Oil Co., 61 Pa. 202; Hayward v. Leeson (Mass.), 49 L. R. A. 725.; Krohn v. Williams, 62 Fed. 869; Wiano Land & Imp. Co. v. Webster, 75 Mo. App. 457. Stock received as a secret profit may be cancelled. Yeiser v. U. S. Board & Paper Co., 107 Fed. 340. A principal is liable for acts of his agent committed in the course of the agent's employment, although the principal did not authorize or justify or participate in, or even if he disapproves of, them. 1 Am. and Eng. Ency. Law (2 Ed.), 1152; Garretzen v. Duenckel, 50 Mo. 104; Wichita Svgs. Bk. v. Railroad, 20 Kan. 519; Railroal v. First Nat. Bk., 10 Neb. 556; Edwards v. Thomas, 66 Mo. 468; Bank of Commerce v. Hoeber, 88 Mo. 37; United States v. State Natl. Bk., 96 U. S. 30. And it applies to misrepresentation and deceit. Bank of Commerce v. Hoeber, 88 Mo. 37; City Natl. Bk. v. Dunn, 51 Fed. 160; Goetz v. Flanders, 118 Mo. 342; Wolfe v. Pugh, 101 Ind. 304; Busch v. Wilcox, 82 Mich. 336; Lynch v. Mercantile Trust Co., 18 Fed. 486; Goetz v. Flanders, 118 Mo. 342; Phipps v. Mallory Com. Co., 105 Mo. App. 67. The rule is not based on presumed authority, but on public policy. Where one of two innocent persons must suffer from the wrongful act of a third, it is more just that the principal who has placed the agent in a position of trust and confidence should suffer than a stranger. Lee v. Sandy Hill, 40 N. Y. 448; Locke v. Stearns, 1 Met. 560; Higgins v. Watervleit & Co., 46 N. Y. 24. A statement by one while conspiracy is in progress is admissible against all. State v. Minton, 116 Mo. 605; State v. Melrose, 98 Mo. 594; Poe v. Stockton, 39 Mo. App. 550; Strohmeyer v. Zepenfeld, 28 Mo. App. 268; State v. Crabb, 121 Mo. 554.

*Smith & Marbury, O. L. Munger* and *W. S. Anthony* for respondents.

(1) Whether the Crommers were promoters is a question of fact and not of law, and must be determined with due regard to all the circumstances. 23 Am. and Eng. Ency. Law (2 Ed.), 233. (2) The Crommers, neither in person nor by their agent Newhouse, originated the incorporation of appellant company. 2 Cook on Stocks and Stockholders (3 Ed.), sec. 705; 23 Am. and Eng. Ency. Law (2 Ed.), 232; Pitts v. Steele Mtle. Co., 75 Mo. App. 221; South Joplin Land Co. v. Case, 104 Mo. 572. (3) If the Crommers and their agent Newhouse were promoters of appellant company, they would occupy the relation of trustees to the company, and the law would require them to act in good faith towards the company, and account to it for all secret profits realized by them, or either of them, and unless such secret profits are traced into their hands, the judgment of the lower court must be affirmed. Burbank v. Dennis, 101 Cal. 90; South Joplin Land Co. v. Case, 104 Mo. 572; 23 Am. and Eng. Ency. Law (2 Ed.), 235; 1 Thomp., Corp., p. 324; Exter v. Sawyer, 146 Mo. 319. (4) The evidence fails to show any conspiracy of the Crommers with Haus, Newhouse and Ewart, or any conspiracy whatever, on the part of the Crommers with any one connected with the deal. Walsh v. Ass'n of Master Plumbers, 97 Mo. App. 292; State ex inf. v. Ins. Co., 152 Mo. 1. (5) The suit by appellant company against the Crommers is the suit of a *cestui que trust* against its trustee, for an accounting to discover and estimate the alleged secret profits appropriated by them to their own use, and appellant can only recover of the Crommers such secret profits as the testimony shows they received and which should have gone to it. If the Crommers did not receive any such secret profits, no recovery can be had against them. 1 Thomp., Corp., p. 325, note 1; Ward

v. Davidson, 89 Mo. 460; Keokuk Packet Co. v. Davidson, 95 Mo. 473. (6) A. J. Haus was the active promoter and incorporator of the company, and was the first president of the company, and E. P. Ewart was its first secretary, each of whom knew every preliminary step taken for the purchase of the property and the organization of the company. Haus was not sued, nor was he introduced as a witness and examined by plaintiff. Will a court of equity, admitting that appellant has a cause of action against defendants for acting as promoters for secret profits alleged to have been realized by them, render its decree by piecemeal, leaving out of consideration Haus, the chief actor in promoting appellant company? Real E. S. Co. v. Collonious, 63 Mo. 295.

GRAVES, J.—Plaintiff, South Missouri Pine Lumber Company, is a Missouri corporation, organized on March 24, 1900, whose certificate of organization was issued by the Secretary of State, March 26, 1900. Plaintiff was organized with a capital stock of $50,000, divided into five hundred shares of $100 each. Of these shares A. J. Haus subscribed for 169; E. P. Ewart, 141; W. F. Maxwell, 95, and E. C. Hartwig, 95. Ewart, who is defendant herein, was an experienced lumberman, formerly of Topeka, Kansas, and later of St. Joseph, Missouri; A. J. Haus, who is no party to the action, was an experienced lumberman of St. Joseph, Missouri; Maxwell and Hartwig, stockholders in the company, with Ewart and Haus, were bankers without experience in or knowledge of the lumber business. The defendants in this case are E. P. Ewart, an original stockholder in plaintiff company, but not such at the time of the suit; S. E. Newhouse, William Crommer, William F. Crommer and S. J. Malugen. From the petition and from the evidence it appears that the two Crommers owned a large tract of land in south Missouri, upon which there was

saw timber of different kinds and character.    They
likewise owned sawmill plants situated upon portions
of their property.   The Crommers were and had been
in hard straits, financially.   At one time, prior to the
transactions involved in this case, they had, through
the instrumentality of S. E. Newhouse of St. Louis,
procured a loan of $3,000 upon this property, from the
Wesleyan College of Warrenton, Missouri.   That, still
being in hard straits, financially, they placed their
property upon the market with defendant S. E. New-
house, authorizing said Newhouse to sell said prop-
erty for $21,000, and agreeing to pay him out of the
$21,000 the sum of $500, and further agreeing with
him that whatever he got over and above $21,000 he
should receive as his commission in addition to the
$500 hereinabove mentioned.   It seems that with this
proposition upon his hands, Newhouse, through one
Martin of Topeka, Kansas, and Brewster of St. Jo-
seph, Mo., interested Haus and Ewart of St. Joseph,
and they in turn interested Maxwell and Hartwig.

     From the start, it appears that Maxwell and Hart-
wig were in favor of organizing a corporation to take
care of the Crommer property, or whatever property
might be bought.   Maxwell would not go in unless
they incorporated.   So far as the evidence shows,
neither Newhouse nor the Crommers knew anything
about these first discussions of organizing and incor-
porating the plaintiff company.   Prior to the organi-
zation of the company it was agreed between Haus,
Ewart, Maxwell and Hartwig, the prospective incor-
porators, that Haus and Ewart should proceed to
south Missouri, and examine the Crommer plant and
lands and negotiate for the purchase of same.   Ac-
cordingly they left St. Joseph for that purpose with
the knowledge of Maxwell and Hartwig.   But before
leaving they had an understanding with Maxwell and
Hartwig that they and each of them had real estate
which they would like to trade in on the deal in lieu of

a cash contribution for their stock in said proposed company. Haus and Ewart went to Elsinore, where the Crommer lumber plant was situated, and were there met by defendant Newhouse, the agent of the Crommers, as well as by the Crommers themselves, together with one Kirkland, who was the timberman for the Crommers. Under the guidance of Kirkland, Haus and Ewart inspected a portion of the timber lands then offered for sale by the Crommers and were asked, especially by young Crommer, to inspect it all. After this inspection and on March 15, 1900, the parties entered into the following contract:

"Elsinore, Mo., March 15, 1900.

"It is agreed, this day by and between Wm. and W. F. Crommer of Elsinore, Mo., parties of the first part, and A. J. Haus, E. P. Ewart, W. F. Maxwell and C. E. Hartwig, of St. Joseph, Missouri, parties of the second part.

"That the parties of the first part, for and in consideration of fifty dollars in hand paid and a further consideration of four hundred and fifty dollars to be paid March 19, 1900, and four thousand five hundred dollars to be paid on the delivery of the deeds to said property hereafter described by parties of the first part to said parties of the second part, and sixteen thousand two hundred and fifty dollars in real estate, located in St. Joseph, Missouri, and Topeka, Kansas, and accepted by S. T. Newhouse, of St. Louis, Missouri, agent for the parties of the first part, and by assuming a certain deed of trust for three thousand dollars, now on said lands, and property deeded by said parties of first part and due in three years from January, 1900, and payable to the Wesleyan College of Warrenton, Missouri, bearing interest at the rate of seven per cent, payable annually and by a deed of trust of thirteen thousand dollars secured on the property deeded by the parties of the first part and payable

in thirteen each, one thousand dollar notes and due in one, two, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen and fourteen months respectively with interest at six per cent from date thereof until paid, agreed to deed by special warranty deed to parties of the second part seven thousand five hundred acres of land located in Butler, Carter and Wayne counties, Missouri, to-wit: Five thousand acres of virgin timber land located as follows: (Description omitted).

"All in township 26, range 4 east, Butler county, Missouri, free and clear of any and all debt, except a certain deed of trust for three thousand dollars above described and which parties of the second part assume and agree to pay and the taxes for 1900.

"Also twenty-two acres of land located in the town of Elsinore, Missouri, together with all improvements thereon and all of the town lots owned by parties of the first part in the town of Elsinore, Missouri, excepting lots Nos. 1, 2, 3, 4, 5, 6, 7, 8, and the lot upon which Horren store building stands, together with all improvements thereon. The above twenty-two acres including the store building, warehouses, houses of all kinds, and sawmill and planing mill and all barns, in fact all improvements thereon, including the machinery in the mills, office fixtures, and furnish bill of sale to stock of goods now in said store building and warehouses, and teams consisting of seventeen mules, one horse and two horses, together with all harness, wagons, log chains, cant hooks, skidding tongs, in fact all tools, etc., owned by said parties of the first part at Elsinore, Missouri. Also a sawmill and planer located near Orchard Switch, and owned by the said parties of the first part and located in section 24, township 27, range 3 east, in Wayne county, Missouri, all property to be free and clear from debt, excepting the three thousand dollar deed of trust as above mentioned, and all taxes for the year 1900 and thereafter which par-

ties of the second part assume and agree to pay.  It is further agreed between said parties that this sale be consummated on or before April 2, 1900, by the said parties of the second part paying over said $4,500 and executing their certain deed of trust as set out above, and executing their certain deeds to real estate as per agreement above, and said parties of the first part delivering their deed to the 7,500 acres and other property above set out at the office of the parties of the first part at Elsinore, Missouri, and it is further agreed that parties of the first part will stop cutting timber on the said lands herein mentioned on the payment of four hundred and fifty dollars next Monday, March 19, 1900, and to turn all mills and other property over to said parties of the second part, April 2, 1900, excepting the planing mill, which parties of the first part reserve the right to use free of cost if needed by them for fifteen days, or until April 15, 1900.  It is understood that the timber cut and now in the yard is not sold under this agreement and parties of the first part have the right to remove same, but not obstruct parties of the second part.

"W. F. Maxwell,
"E. C. Hartwig,
    "By E. P. Ewart,
"Wm. Crommer,
"W. F. Crommer, Jr.,
"A. J. Haus,
"E. P. Ewart."

About the time the contract above quoted was signed, Haus and Ewart wrote and telegraphed Maxwell to come down and inspect the property.  Maxwell was there on March 19th, saw what purported to be a portion of the property, accepted the contract and paid the $450 mentioned in the contract.  He then returned to St. Joseph, where, later, on the dates hereinabove mentioned, plaintiff corporation was organized and chartered.  Maxwell and Hartwig each put

in $5,000 in cash. On April 2, 1900, deed was made
by the Crommers to the corporation, at which time
Hartwig and his attorney, Rusk, were present, to-
gether with Haus and Ewart, who had gone to Elsi-
nore a day or two previous. At this time the deed
was received and the deed of trust made back to the
Crommers. All of the parties were afforded ample
opportunity to inspect the property.

This action is to cancel the last six notes of $1,000
each, mentioned in the contract above set out, as well
as in the deed of trust, and further to "recover of de-
fendants, William Crommer, William F. Crommer, E.
P. Ewart and S. E. Newhouse, the value of the stock
issued by plaintiff to the defendant, E. P. Ewart, and
by him sold to the said Doyle. That plaintiff recover
of said defendants the value of the stock issued to the
said A. J. Haus, and that the difference in the value
between the property contracted to be sold and deliv-
ered under the contract of March 15, 1900, and the
value of the property actually delivered either under
that contract or said supplemental contract of Janu-
ary 18, 1901, be ascertained, and that plaintiff recover
of defendants judgment for the amount of said dif-
ference." Then follows a prayer for an injunction
asking that the sale under said mortgage be restrained
and that further attempt to collect said six notes be
enjoined and restrained.

It appears from the petition and from the evi-
dence that previous to this action, E. P. Ewart had
been bookkeeper and general manager of plaintiff, and
had sold his stock to one Doyle, who thereupon as-
sumed the duties exercised by Ewart. It also appears
from the evidence that Ewart was crowding Doyle
upon some securities given in payment of his stock, and
thereupon Doyle discovered in the books of the com-
pany that fraud had been committed upon the com-

pany in the purchase of these lands, to the effect that
the Crommers had never asked nor received more than
$21,000 therefor, and the company had paid $37,500.
It might be well to remark here that the four incorpo-
rators, after these lands had been acquired, put them
into the corporation at the price and sum of $50,000,
thus issuing to themselves full paid stock.

It further appears from the evidence that it was
claimed that the Crommers had misrepresented the
lands conveyed, in so far as to what amount was cov-
ered by virgin timber, and in settlement of this dispute
a supplemental contract was made, which supple-
mental contract was as follows:

"It is agreed and entered into this 18th day of
January, 1901, by and between Wm. Crommer, of Bel-
grade, Washington county, Mo., and W. F. Crommer,
of Carter county, Mo., parties of the first part, and
the South Missouri Pine Lumber Co., of St. Joseph,
Mo., duly incorporated in Missouri, by A. J. Haus,
its president, and E. P. Ewart, its secretary, party of
the second part.

"That parties of first part, in consideration of one
dollar, the receipt of which is hereby acknowledged,
and a further consideration in lieu of any timber that
may have been cut out of the lands contracted by said
parties of the first part, March 15, 1900, and deeded as
virgin timber, to said party of the second part, agrees
to deed by special warranty deed to the party of the
second part the following lands in Butler county,
Missouri: (Description omitted.)

"Also the standing timber on 400 acres owned by
parties of the first part and known by party of the
second part and located in section 26, township —,
range 3 E., Carter county, Missouri, to-wit: (Descrip-
tion omitted.)

"And accepted by said second party and credit
notes held by said parties of the first part and secured
by deed of trust to the amount of $1,750 in full of all

claims or damages of said second party against said first parties for any shortage as above described, and it is further agreed that said parties of the first part shall have 90 days time to secure the lands to be agreed upon in the 480 acres mentioned above.

> "WM. CROMMER,
> "W. F. CROMMER,
> "SOUTH MISSOURI PINE LBR. Co.,
> "Per A. J. HAUS, President,
> "Per E. P. EWART, Secretary."

"We, William and W. F. Crommer, of Elsinore, Mo., agree this 18th day of January, 1901, to extend notes number 8, 9, 10, 11, 12 and 13, due January 2nd, February 2nd, March 2nd, April 2nd, May 2nd, and June 2nd, 1901, respectively, made by the South Missouri Pine Lumber Company, April 2, 1900, for one thousand dollars each, with interest at six per cent from date thereof and secured by deed of trust, note No. 8 due January 2, 1901, to May 2nd, each of the others every six months thereafter respectively until paid. In return said South Missouri Pine Lumber Company are to pay note No. 4, due Sept. 2nd, on or before January 26, 1901, with interest thereon from date thereof at German Savings Bank, St. Louis, Mo., instead of Elsinore, Mo., and notes No. 5, 6 and 7, due Oct. 2nd, Nov. 2nd, and Dec. 2nd, 1900, respectively, with interest thereon at same bank on or before February 16, 1901, less credit of $1,750 as per contract of this date made between us and the South Missouri Pine Lumber Company.

"We further agree to use said moneys to be paid into German Savings Bank in payment of four hundred and eighty acres of land as per contract of this date or so much as will be needed of same, said money to be paid by said Bank and checked on orders made by S. E. Newhouse until said four hundred and eighty acres are purchased and contract of this date complied with.

"WM. CROMMER,

"W. F. CROMMER,

"SOUTH MISSOURI PINE LBR. CO.,

    "Per A. J. HAUS, President,

    "Per E. P. EWART, Secretary."

The evidence, or the weight of the evidence, shows a practical compliance with this supplemental contract by the Crommers. It was so nearly fulfilled that no great substantial damage could accrue to the company. It is extremely doubtful, under the facts, whether there was any liability upon the part of the Crommers under the first contract.

Defendant Malugen was sheriff and acting trustee in the deed of trust. The property had been advertised for sale under the deed of trust at the institution of this action, which sale was stayed by the temporary injunction granted. The substantial defendants answered by way of general denial, pleaded the second contract as a settlement and adjustment of all matters, and asked affirmative relief by way of a decree of foreclosure. Reply, general denial. The record of evidence is contained in something like nine hundred printed pages. The trial court after hearing all the evidence, some competent and much incompetent, dismissed plaintiff's bill and also dismissed defendants' cross-bill asking for decree of foreclosure, thus leaving the parties standing just where they were previous to the action. But later the court so modified the decree as to keep the temporary injunction in force until the termination of the cause in this court. Plaintiff thereupon appealed.

The only evidence in any way detrimental to the Crommers is an alleged admission by Wm. Crommer, testified to by the witness Kirkland, to the effect that he (Crommer) knew that Ewart and Haus were raising the price from $21,000 to $37,500 before the deal was closed. This is the only substantial evidence of

any conspiracy upon the part of the Crommers to aid and abet Haus and Ewart in defrauding the proposed corporation. Haus, who was at the time of the trial a stockholder in the corporation, and an alleged party to the fraud, did not testify. Nor was he made a party to the suit, although the evidence of plaintiff would tend as strongly to involve him as to involve Ewart, and more strongly to involve him than the two Crommers.

Upon behalf of the defendants, it was admitted by all that the Crommers only got $21,000 for their property. They emphatically denied any conspiracy or agreement to raise the price of the property to defraud plaintiff corporation. Newhouse, and the Crommers, denied having anything to do with the incorporation of plaintiff, or any knowledge of its incorporation, until such time as the deed was made, when the incorporators directed the deed to be made to plaintiff. For them the evidence shows that Newhouse got all the property at St. Joseph and Topeka, and out of it paid Martin, the real estate man at Topeka, $1,250, and Brewster of St. Joseph, $450. They testify that to the four promoters of plaintiff corporation, but one price was ever made by the defendants, Newhouse and Crommers, and that was $37,500. This price was fixed by Newhouse and the Crommers acquiesced in it, knowing that Newhouse was to get the difference between $21,000 and $37,500.

The evidence also shows that the property was in fact worth $40,000 or more, when plaintiff acquired it. In fact, Doyle, one of plaintiff's stockholders and its general manager, makes an estimate of the timber on the land, which would show that the property must have been worth $40,000 or more. Such further portions of the evidence as may be necessary will be noted in the course of the opinion.

OPINION.

I. The record discloses many lapses of memory in the witnesses. Nor is this confined to one side of the cause. Again, plaintiff's general manager, Doyle, in effect admitted that he had been promised a consideration by Maxwell to testify as he, Maxwell, did. The testimony of Newhouse and Ewart is by no means clear and satisfactory, but to one used to the many schemes of real estate agents, where they are to get other than a fixed commission, a fair conclusion can be drawn from it. This, however, we will discuss hereafter.

First, were Newhouse, and Crommers, in any sense promoters of the corporation? Under the evidence, we say, no. The trial court was amply justified in finding that the parties were not promoters. "Whether a person is or is not a promoter is a question of fact and not of law, and must in each case be determined with due regard to all the circumstances." [23 Am. and Eng. Ency. Law (2 Ed.), 233.] The same authority, at page 232, defines promoter thus: "A promoter is a person who takes such preliminary steps in the formation of a corporation as to bring himself into a fiduciary relation thereto, analogous to that of trustee and *cestui que trust.*" Cook on Stock and Stockholders (2 Ed.), sec. 651, gives the following definition: "A promoter is a person who brings about the incorporation and organization of a corporation. He brings together the persons who become interested in the enterprise, aids in procuring subscriptions, and sets in motion the machinery which leads to the formation of the corporation itself." Our court has adopted practically the same definitions. [Exter v. Sawyer, 146 Mo. 302; Land Co. v. Case, 104 Mo. 572.] There is nothing in this evidence to bring Newhouse or the Crommers within the definition of a promoter. No evidence here that they helped organize plaintiff cor-

poration. Haus, Ewart, Maxwell and Hartwig had agreed to go into the sawmill business and to organize a corporation, before they ever saw either Newhouse or the Crommers. They had also agreed before they ever saw Newhouse or the Crommers that Haus and Ewart should put in property instead of cash, if they could do so. They had agreed upon all the stockholders of the corporation. These agreements and understandings were in St. Joseph before Haus and Ewart went to Elsinore, the location of the Crommer plant, where they, for the first time, met the Crommers and Newhouse.

Newhouse and the Crommers in no way solicited subscribers to the stock of the contemplated corporation. No court could, under the evidence in this record, say that these parties were promoters. So that it follows that upon this theory of plaintiff's case, the defendants Newhouse and the Crommers are not liable. This of course leaves out of consideration the alleged conspiracy between Ewart, who was a promoter, and Newhouse and the Crommers. This we consider next.

II. Plaintiff next urges that even if Newhouse and the Crommers were not technically promoters, yet Ewart was a promoter, and if Newhouse and the Crommers aided and abetted him in the perpetration of a fraud upon the company, they are liable in a joint action with Ewart. There is no question that Ewart was a promoter. Now, as to the alleged conspiracy between Ewart, Newhouse and the Crommers. To show this conspiracy to defraud the corporation by raising the price from $21,000 to $37,500, plaintiff showed that Haus put in property not worth more than $4,500 for $8,750; that Ewart claimed to put in the property of his father not worth more than $4,500 for $7,500, but in fact put in no property at all; that the Haus property was deeded to one Edwards, a friend of Ewart, and Edwards placed a loan thereon

for $2,200 and out of the proceeds paid Brewster $450 and turned over the remainder to Ewart; that Edwards afterwards deeded the Haus property to Carrie Thorn, the fiancee, and later the wife of Newhouse; that Newhouse afterwards sold the property for less than it was worth. They also show by Kirkland, who became the timberman for the company after the purchase from the Crommers, and who was in the service of the company at the date of the trial, that Wm. Crommer had admitted that Haus and Newhouse raised the price of the property and that he knew it. This is in substance the plaintiff's case upon the alleged conspiracy.

Ewart, Newhouse, and the two Crommers each deny that there was any agreement or understanding between the parties to raise the price. Wm. Crommer, who denied the talk with Kirkland, is shown to be a man of excellent reputation and the evidence given by him and his son bear the earmarks of honesty. Newhouse and Ewart say that after the delivery of the deed to the Topeka property, Ewart paid Newhouse $2,500 in cash and took up the deed. They also say that Ewart paid Martin $1,250 out of the loan on the Haus property, as his part of the commission in making the sale, and the remainder was paid by Ewart to Newhouse. They explain that Edwards was made grantee in Haus's deed for the reason that Martin did not know Newhouse and wanted his commission secured and asked Ewart to see to it for him. Martin knew Edwards and was willing to trust him. Newhouse had been sick for a long time and had large debts hanging over him and was anxious to get cash rather than property. Ewart had sold out his lumber business in St. Joseph, and had the money with which to take up the deed to his father's property. In our judgment Newhouse was getting the property which was being put in and would thereby be making a very nice commission for one financially in hard straits,

and was not very particular at what price the property was being valued at in the trade. On the other hand, Haus and Ewart were getting large blocks of stock by putting in their property at an inflated value. In other words, they took advantage of Newhouse's eagerness to trade to get big values for their real estate and thereby larger amounts of stock in their proposed corporation. When the trade was closed by the original contract, Newhouse set about to realize money out of the property and did so irrespective of the inflated valuation. This theory is consistent with all the evidence.

"Fraud will not be presumed when all the facts in the case consist as well with honesty and fair dealing as they do with an intention to defraud." [Rumbolds v: Parr, 51 Mo. 1. c. 598.]

See, also, on the same proposition: Dallam v. Renshaw, 26 Mo. 533; Henderson v. Henderson, 55 Mo. 534; Glover v. American Cas. Ins. & Sec. Co., 130 Mo. 173; New England Loan & Trust Co. v. Browne, 177 Mo. 412.

Fraud and collusion will not be presumed, and the burden is on the party charging them to reasonably satisfy the chancellor that they in fact exist. [New England Loan & Trust Co. v. Browne, supra.]

In the case at bar the trial court heard all the parties testify from the witness stand. Their demeanor could be observed. Their facial expressions could be read. Under such circumstances the finding of the chancellor is entitled to some consideration by this court. The authorities on this question are thoroughly reviewed by Fox, J., in the Browne case, supra. In that case Judge Fox says: "We also fully recognize the duty of appellate courts, in equity cases, to supervise the decrees of the trial court, to the end that they may ascertain that its judgment is clearly in keeping with good conscience and justice. There is also another rule, equally well settled, in respect to

the deference paid to the finding of the chancellor. While this latter rule should not interfere with the power of the appellate court to supervise the judgment of the trial court, and occasion this court to lessen its strictness in scrutinizing the findings of the chancellor, yet the action of the trial court should not be absolutely ignored; but that due and appropriate consideration should be given to such findings to which they are entitled, under the well-settled rules, as announced by this court.''

An examination of this voluminous record shows no sufficient ground for disturbing the decree of the trial court, and the judgment is therefore affirmed, and temporary injunction dissolved.

*Valliant, P. J.,* and *Lamm, J.,* concur; *Woodson, J.,* not sitting.